# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 208 - RELATED TO 01C796 | **DATE** | 3/29/2002 |
| **CASE TITLE** | BLACK, et al and del Valle, et al vs. WILLIAM M. McGUFFAGE, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants' motions to dismiss are granted in part and denied in part. Enter Memorandum Opinion and Order. (01C208 - #43-1,44-1,46-1,58-1,64-2,66-1; 01C796 -#0-1,12-1, 0-1,15-1,23-1,26-1,29-1).

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | MAR 29 2002 |
| K | Docketing to mail notices. | date docketed |
| | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | |
| | courtroom deputy's initials | date mailed notice |
| | Date/time received in central Clerk's Office | mailing deputy initials |

**Document Number**

36

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Black, et al., and | ) | |
| | ) | |
| Miguel del Valle, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 01 C 208 |
| Vs. | ) | No. 01 C 796 |
| | ) | |
| William M. McGuffage, *et al.*, | ) | Judge Ronald A. Guzman |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court are numerous motions of Defendants to dismiss Plaintiffs' amended

complaint for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P.

12(b)(6). For the reasons set forth below, the motions are granted as to Plaintiffs' privileges and

immunities clause claim and denied in all other respects.

## BACKGROUND FACTS

The presidential election of 2000 highlighted to the public, in a most dramatic way, the

serious flaws in voting systems used throughout the country. These flaws, unfortunately, did not

fully come to light until a presidential election took place in which the margin of victory in one

State, Florida, was less than the margin of error of the voting system used. Of these systems,

none in particular received more attention than the punch card ballot system. Arguably error

1

associated with the punch card system, both human and mechanical, directly influenced the outcome of that election. Therefore, the aftermath of November, 2000, has caused many to question the use of the punch card system, or others that may be prone to such error.

Neither the federal courts, nor likely anyone, can guarantee to every eligible voter in this country a perfect election with 100% accuracy. The courts can, however, by enforcing the Fourteenth Amendment to the U.S. Constitution and the Voting Rights Act of 1965, guarantee the equal treatment of voters who attempt to have their votes counted, their voices heard.

This case is a civil rights class action challenging the system of voting in Illinois. The Plaintiffs are Latino and African American voters in counties throughout Illinois. Defendants include Members of the Illinois State Board of Elections, Chicago Board of Election Commissioners and various county and county clerks throughout Illinois (among them Cook County and County Clerk David Orr; County of Alexander and Alexander County Clerk, Gloria Patton; Will County and Will County Clerk, Jan Gould; Sangamon County and Sangamon County Clerk, Joe Aiello).

Plaintiffs challenge the state's certification and approval, and the local Defendants' selection and use of: (1) punch card voting systems, (2) voting systems that lack effective error notification, and (3) voting systems with inadequate education of voters, inadequate training of and assistance from election judges, and inadequate ballot design. Plaintiffs allege that all of these systems violate Section 2 of the Voting Rights Act of 1965, and that the State's approval of these different systems violates the Fourteenth Amendment to the U.S. Constitution. Plaintiffs seek declaratory and injunctive relief, including but not limited to an order requiring the state to certify and approve, and the local Defendants to select and use, voting systems that do not have a disparate impact against African American and Latino voters. Plaintiffs allege that African

American and Latino voters are disproportionately forced to use--and are disproportionately injured when they use--the challenged voting systems.

Under Illinois' Election Code 10, ILCS 5/1-1 *et seq*., counties may use several voting systems certified by the Illinois State Board of Elections, including a punch card system as well an optical scan system. Some of these systems have error notification procedures, which notify a voter when the ballot contains a disqualifying error. The Election Code further authorizes two different ways of counting the ballots: in-precinct (each precinct has tabulators that provide election judges with the official vote for that precinct) and central count (ballots are counted at the end of the night in a central location). In a central count jurisdiction, it is physically impossible to use error notification technology.

Currently, Illinois jurisdictions use one of four voting systems: optical scan ballots with in-precinct counting (including error notification), optical scan ballots with central counting (without error notification), punch card ballots with in-precinct counting (including error notification) and punch card ballots with central count (without error notification).

Selection of the voting system and method of counting is left to each of the 110 local election authorities in Illinois, subject to certification and approval by the State Defendants. In 2000, ten election jurisdictions used optical scan systems with in-precinct counting; three used optical scan systems with central counting (including East St. Louis); two used punch card systems with in-precinct counting (including the City of Chicago and Cook County); and 95 used punch card systems with central counting (including Alexander County, Sangamon County, Whiteside County and Will County).

A residual vote occurs when a voting system determines that a ballot does not contain a permissible vote in a particular race, notwithstanding the voter's actual intent. Punch card voting systems are especially prone to ballot error. Such failures are caused by machine defects and the predictable and normal interaction between voters and the machines. These included the buildup of chad in the machines, improper placement of the ballot into the recording device, and improper use of the stylus. These problems can result in ballots that cannot be read by the vote counting machines. Other problems include misaligned recording devices, recording devices not easily read at the angle by the voter, and confusing ballot designs, *e.g.*, the "butterfly ballot." Because of these problems, voters sometimes cannot properly match the names of candidates to the correct chad. Also, there may be inadequate education of voters in how to use the equipment, and/or inadequate assistance from election judges.

Optical scan voting systems are also prone to ballot error because of the predictable and normal interface of voters with the machines. Voters may make a mark that is not sufficiently large, use an improper writing implement, or mark the wrong area. Voters may properly mark the oval for their preferred candidate and also write in the name of the preferred candidate, which would cause an overvote. Finally, the vote counting machine may identify stray marks as votes, which would also cause an overvote.

Presently, the two Illinois jurisdictions that use punch card voting systems with in-precinct counting, Chicago and Cook County, use the "PBC 2100" to count votes. The PBC 2100 has been used already in the municipal elections of Cook County in February and April, 2001. The system is not capable of providing effective error notification in certain circumstances, however. First, if a ballot contains a single undervote, the PBC 2100 will not detect any overvotes. Second, in a race where a voter may vote for more than one candidate, the

4

PBC 2100 will not detect any undervotes. Third, the PBC 2100 can detect only two residual votes at a time. Thus, if a punch card contains more than two residual votes, voters must return to the recording device two or more times. Fourth, many voting precincts straddle a jurisdictional boundary. When some voters in a precinct are entitled to vote in a contested election but other voters are not, the PBC 2100 will improperly determine that every ballot cast by the latter voters contains an undervote. Defendants remedy this problem by deactivating the undervote notification for these races. Fifth, where there is one candidate listed on the ballot and one certified write-in candidate, the PBC 2100 will count the undervote alert upon a vote for the latter but not a vote for the former. Because of concern that these differences might undermine voter secrecy, Defendants deactivate the undervote notification for these races.

The average residual vote rate across Illinois, for ballots cast for president in the November, 2000 presidential election, was approximately 3.85%. This rate varied substantially among Illinois jurisdictions. Jurisdictions using optical scan ballots with error notification the average residual vote rate was less than 1%. The rates ranged from 0.32% in McHenry County to 1.07% in Franklin County. In jurisdictions using punch card ballots without error notification the average residual vote rate was more than 4%. For example, in Chicago, the rate was 7.06% citywide, 12.59% in the 12th ward, 12.4% in the 37th ward, and 36.73% in the 48th precinct of the 29th ward. Similarly, the rate was 5.23% in suburban Cook County, 8.8% in the Cicero Township of Cook County and 7.48% in Alexander County. The rate was 3.17% in Whiteside County, 2.48% in Will County, and 2.15% in Sangamon County. In the three election jurisdictions which use optical scan ballots without error notification the average residual vote

rate was more than 4%. For example, the rate was 10.88% in all of East St. Louis, but 22.30% in the 20th precinct of East St. Louis.

A recent state court decision interpreted the Illinois Election Code with regard to error notification technology in punch-card jurisdictions. *See Tully v. Orr*, No: 01 CH 00959 (August 23, 2001). The *Tully* court ruled that Section 24A of the Illinois Election Code, which applies to punch card jurisdictions, neither requires, nor prohibits the use of error detection technology. Therefore, the use of error detection technology is discretionary. *Id.* at 5. The court further rejected the Plaintiffs' claim that they have a substantive due process right to voter error detection. *Id.* at 19.

The majority of Illinois counties use the punch card voting system. The Plaintiffs allege that those jurisdictions that employ either punch-card voting systems or provide optical scan without error notification experience a higher percentage of residual votes than those jurisdictions that use optical scanning equipment with error notification (a residual vote is a ballot that does not contain a permissible vote). Therefore, Plaintiffs conclude that individuals living in punch card jurisdictions have a greater statistical probability of not having their votes counted. Finally, Plaintiffs argue that the counties with the punch-card system have larger populations of minorities than do counties using other voting systems, and thus use of those less accurate machines has a disparate impact on minority voters.

On April 13, 2001, Plaintiffs filed an amended complaint alleging the above facts. Plaintiffs claim these voting systems violate Section 1973 of the Voting Rights Act of 1965 (commonly referred to as Section 2 of the Voting Rights Act), as well as the equal protection and due process clauses of the fourteenth amendment. Plaintiffs seek an entry of a preliminary

injunction, and following a trial on the merits a permanent injunction prohibiting the use of punch card voting systems and voting systems that lack effective error notification.

## DISCUSSION

### Standard for Dismissal

A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). The court will accept as true all well pleaded factual allegations and view them in a light most favorable to the non-moving party. *Id.*

Defendants move to dismiss Plaintiff's Section 2 and constitutional claims on the grounds that 1) there is no case or controversy under Article III, 2) Plaintiffs have failed to state a claim under Section 2 of the Voting Rights Act, 3) Plaintiffs have failed to state an equal protection or due process claim under the Fourteenth Amendment, and 4) the Eleventh Amendment immunizes the County Clerks from Plaintiffs' constitutional claims. Each of these arguments for dismissal will be addressed separately.

### Article III

A. Standing

Defendants first argue that Plaintiffs lack standing under Article III of the U.S. Constitution because they fail to allege injury to their own individual rights. To satisfy the minimum standing requirements, a plaintiff must demonstrate: 1) an injury in fact; 2) a causal link between the injury and the conduct complained of; and 3) a likelihood that a favorable decision will redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Defendants argue that Plaintiffs have asserted a generalized grievance and that the statistical likelihood of future injury is insufficient to bring standing. Plaintiffs allege that African American and Latino voters suffered injury when they use the challenged voting systems because they voted in the 2000 election in precincts recording a substantial and disproportionate number of undervotes. As the district court held in *Andrews v. Cox*, No. 1:01-CV-319-ODE (N.D. Ga. Aug. 20, 2001), "plaintiffs sufficiently allege a personal injury...by the disproportionate risk of having their votes not counted." Slip op. at 8. The ballot machinery used in the jurisdictions in which Plaintiffs vote increases the likelihood that their votes will not be counted. That "probabilistic injury is enough "'injury in fact'... to confer standing in the undemanding Article III sense." *North Shore Gas Co. v. EPA,* 930 F.2d 1239, 1242 (7th Cir. 1991). *See also, Tucker v. United States Dept. of Commerce,* 958 F.2d 1411, 1415 (7th Cir. 1992) (holding that Illinois voters were injured by failure to adjust census, because adjustment might increase the state's seats in the House of Representatives, and "for all we know ... might" increase the State's federal funds); *Bryant v. Yellen,* 447 U.S. 352, 366-67 (1980) (holding that residents who desired to purchase farmlands had standing to challenge a court decision holding inapplicable a land reclamation law where it was likely that lands would become available at less than market prices if the law were applicable).

In the 2000 Presidential race, the probability of an uncounted vote was 22 times greater in Chicago, which used one of the challenged voting systems, than in McHenry County, which did not. The "probabilistic" injury is particularly high for those named Plaintiffs whose election precincts had particularly high residual vote rates, including Clarence Dossie (precinct 2 of Cairo had a rate of 11.32%) and Fern Watts (precinct 5 of East St. Louis had a rate of 13.52%). Because the voting process is anonymous, it is impossible for any one voter to know with more

certainty that their intended votes were not counted. If standing in cases like this one required more, then no one would have standing to challenge a system with, for example, a 20% or 30% or 60% residual vote rate, or a policy under which every tenth ballot was systematically discarded instead of counted. Such results would be contrary to both voting rights and standing law. Further, the injury here alleged, is not the State's failure to count any one person's vote, but the higher probability of that vote not being counted as a result of the voting systems used, *i.e.*, vote dilution. That injury is both provable and traceable to Defendants' actions given the facts alleged. Vote dilution as "directly related to voting, the most basic of political rights, is sufficiently concrete and specific." *FEC v. Akins*, 524 U.S. 11, 25 (1998). Therefore, the court concludes that Plaintiffs have standing to raise the claims asserted.

B. Ripeness

Defendants argue that the PBC 2100 (the current error detection technology used for punch card ballots) must be used in an election and shown to be inadequate before the court can grant an injunction prohibiting the technology. According to the Defendants, until the PBC 2100 is used in an election, it would be sheer speculation to claim that the error notification capabilities are inadequate. Accordingly, they argue the PBC 2100 will not be ripe for review until the error notification function of the PBC 2100 is actually used in a citywide or statewide election and produces results that could form the basis of a claim.

Plaintiffs argue that their claims are not rendered "moot" by the Defendants' planned voluntary employment of limited error notification, because nothing *requires* the Defendants to provide the error notification. The Plaintiffs contend that the original practices could recur and Defendants' voluntary conduct will not address all of the "remaining effects" of the deficient

voting practices and procedures identified by the Plaintiffs. These practices and procedures include first, that the error notification provided by the PBC 2100 is inadequate, no matter how it is employed in practice, further, that this error notification will not address the intrinsic error-causing deficiencies of punch card ballots, which will still be used and finally, that the "limited" error notification capabilities will not be used statewide.

As the Supreme Court has stated, the ripeness doctrine "is drawn from both Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs.,* 509 U.S. 43, 57 (1993). Article III confines federal courts to adjudicating "actual, ongoing cases or controversies." *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477 (1990). A case is not ripe if it depends "upon contingent future events that may not occur as anticipated" or involves "abstracting disagreements over administrative policies." *Texas v. United States,* 523 U.S. 296, 300 (1998). To determine whether a claim is fit for judicial decision, a court evaluates "whether the issue is '(a) essentially legal, and (b) sufficiently final.'" *Consol. Rail Corp. v. United States,* 896 F. 2d 574, 577 (D.C. Cir. 1990). Because the PBC 2100 will more than likely be used by Chicago and Cook County in upcoming elections in which Plaintiffs will case votes we find that this case is sufficiently ripe under Article III. Plaintiffs do not have to wait for yet another opportunity for their votes not to be counted before bringing suit.

### Voting Rights Act Section 2

The Voting Rights Act of 1965 is a broad remedial statute, which the Supreme Court has emphasized "should be interpreted in a manner that provides 'the broadest possible scope' in combating racial discrimination." *Chisom v. Romer,* 501 U.S. 380, 403 (1991) (quoting *Allen v.*

*State Bd. Of Elections*, 393 U.S. 544 (1969). Section 2 prohibits the use of any electoral practice or procedure that "results in" a denial or abridgement of the right of any citizen to vote on account of race or color or membership in a "language minority" group. The scope of the right to vote protected by Section 2 is expansive. It expressly includes protection for "all action necessary to make a vote effective," including "casting a ballot and having such ballot counted properly." 42 U.S.C. § 1973*l*(c)(1).

Section 2(b) of the Act defines when a violation of Section 2 occurs. It provides that an electoral standard, practice or procedure results in a violation of the right to vote whenever:

> [b]ased on the totality of circumstances, it is shown that the political processes leading the nomination or elections in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973(b).

Courts have applied Section 2 to a broad array of election practices, including practices related to the tabulating of votes. *See, e.g., Roberts v. Wamser,* 679 F. Supp. 1513, 1532 (E.D. Mo. 1987) (failure to manually re-count punch card ballots not counted by tabulating equipment), *rev'd on other grounds,* 883 F.2d 617 (8th Cir. 1989); *Goodloe v. Madison County Bd. Of Elections Comm'rs,* 610 F.Supp. 240, 242 (S.D. Miss. 1985) (failure to count absentee ballots); *United Sates v. Post,* 297 F.Supp. 46, 51 (W.D. La. 1969). There are two statutory elements to a claim under Section 2: (1) the use of an electoral "standard, practice or procedure," and (2) a resulting diminution of the opportunity to African American and Latino voters "to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(a)-(b). Plaintiff's complaint satisfies the necessary elements under Section 2.

Plaintiffs have identified an electoral practice (deficient ballot systems), and have alleged that because of that practice they have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice. Discriminatory results in an election practice have been found sufficient to state a Section 2 violation. *Bruton v. City of Belle Glade,* 178 F.3d 1175, 1196 (11th Cir. 1999), and the "totality of circumstances" requiring analysis under Section 2 cannot be fully ascertained in this case except through discovery and possibly trial. Under the facts alleged in the first amended complaint, the disparate rates of undervotes indicates that Plaintiffs, as voters residing in predominantly Latino and African American precincts where punch card machines are utilized, bear a greater risk that their votes will not be counted than do other voters. As such, Plaintiffs' participation in the political process could be significantly diminished. Accepting Plaintiffs' facts as true we find Plaintiffs' Section 2 allegations sufficient to state a claim.

Defendant County Clerks Gould, Aiello, and Patton also argue that claims against them should be dismissed because the complaint does not allege any facts specific to them. However, the complaint sufficiently alleges that all named officials were involved in the selection of voting equipment and, as such, the Voting Rights Act claims against them can stand.

### Equal Protection Clause

We turn to the issue of equal protection. The Fourteenth Amendment states that "[n]o State shall deny to any person within its jurisdiction the equal protection of the laws." Today, the equal protection clause has been interpreted to forbid certain forms of classification that cannot be justified by compelling or important governmental objectives. To this end, the Supreme Court has constructed a system of varying levels of scrutiny depending on the

classification involved. All racial classifications, for example, are subject to strict scrutiny, constitutional only if narrowly tailored to a compelling governmental interest. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995). Classifications based on sex are subject to intermediate scrutiny, and are constitutional if substantially related to an important governmental objective. *Craig v. Boren*, 429 U.S. 190 (1976). Classifications which affect fundamental rights are also subject to strict forms of review. *Shelton vs. Tucker*, 364 U.S. 479, 488; 81 S.Ct. 247, 252 (1960); *Griswold vs. Connecticut*, 381 U.S. 479, 504, 85 S.Ct. 1678, 1692 (1965); *Skinner Vs. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113 (1942) .

The first question that must be asked when evaluating an equal protection claim is, therefore, whether there is a classification. Laws neutral on their face, but which happen to have a disparate impact on certain groups, do not necessarily violate equal protection. *Washington v. Davis*, 426 U.S. 229 (1976). It does not appear that Plaintiffs allege any classification based on suspect criteria or any intent to discriminate against minority voters. Plaintiffs allege only that the counties' use of different voting systems in different parts of the state violates the equal protection clause of the U.S. Constitution. The Defendants argue that, because no invidious discrimination or suspect classification has been alleged here, the voting system should be subject only to a rational basis test, and that rational justifications for the system exist. Plaintiffs, on the other hand, argue that the correct test is strict scrutiny. Since Plaintiffs' complaints allege an arbitrary action by Defendants it is not necessary to decide this issue at this time.

While the State does not *per se* classify citizens by enacting a law that allows local authorities to choose their voting systems, or by approving different methods of voting with different rates of accuracy, the Supreme Court has not strictly adhered to the suspect

classification doctrine when addressing cases of voting rights with respect to States. An example of this is the case that resolved the controversy that has sparked the current debate, *Bush v. Gore*, 531 U.S. 98 (2000). In *Bush*, the Court was faced with a statewide election recount, ordered by the Florida Supreme Court, which adhered to no uniform standard of counting. The recount process, it said, was inconsistent with the minimum procedures necessary to protect the fundamental right of each voter in the special instance of a statewide recount. *Id.* at 109. Although the Court limited its decision to the then present circumstances, *id.*, the rationale behind the decision provides much guidance to the situation in this case, which presents, as far as this Court can tell, a matter of first impression in this Circuit and, indeed, this country. That question is whether a state may allow the use of different types of voting equipment with substantially different levels of accuracy, or if such a system violates equal protection.

The right to vote, though one cherished throughout the history of our republic, is by no means absolute. Indeed, the only offices in the United States that are constitutionally required to be elected ones are those of Congress, and even then, citizens are eligible to vote for members of Congress only if they are also eligible to vote for members of their state legislature, U.S. Const. art. I, § 2; amend. XVII, subject, of course, to the 15th, 19th, and 26th amendments. The right to vote, therefore, is vested primarily in the States to endow.

However, once the State has endowed voting rights to its citizens, "the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush*, 541 U.S. at 104. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 104-105. That is precisely what Plaintiffs allege the Defendants have done.

Other voting rights cases related to equal protection have involved actual classifications by the State, conscious decisions to treat particular groups of people differently than others. For instance, in *Reynolds v. Sims*, 377 U.S. 533 (1964), the Alabama state legislature passed a legislative apportionment scheme that was not based on population. As a result, voters in certain areas had less representation in their legislature than voters in other areas, solely because of where they lived. The Court found that "[d]iluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment." *Id.* at 566. In doing so the Court engaged in a detailed analysis of various proposals by the state and found them lacking. Clearly the Court was not practicing a deferential analysis. Likewise, in *Moore v. Ogilvie,* 394 U.S. 814 (1969), the Court ruled unconstitutional an apportionment plan that gave greater electoral strength to voters in rural counties than urban counties.

This case presents a situation much more analogous to that in *Bush* than that of other voting rights cases. Here, as in *Bush*, the State is not classifying citizens insofar as it is choosing one system of voting for some and a different system of voting for others, nor is it choosing to dilute the votes of some and not dilute the votes of others, as in *Reynolds* and *Moore.* Rather, it leaves the choice of voting system up to local authorities. But that choice necessarily means that some authorities will choose a system with less accuracy than others. As a result, voters in some counties are statistically less likely to have their votes counted than voters in other counties in the same state in the same election for the same office. Similarly situated persons are treated differently in an arbitrary manner. As in *Bush* the lack of a rational basis for implementing a different system of vote counting results in vote dilution. In addition, the Plaintiffs in this case allege that the resulting vote dilution, which was found to be unacceptable in *Busch* without any

evidence of a disproportionate impact on any group delineated by traditional suspect criteria, is impacting African American and Hispanic groups disproportionately.

That people in different counties have significantly different probabilities of having their votes counted, solely because of the nature of the system used in their jurisdiction is the heart of the problem. Whether the counter is a human being looking for hanging chads in a recount, or a machine trying to read ballots in a first count, the lack of a uniform standard of voting results in voters being treated arbitrarily in the likelihood of their votes being counted. The State, through the selection and allowance of voting systems with greatly varying accuracy rates "value[s] one person's vote over that of another," *Bush*, 531 U.S. at 104-105, even if it does not know the faces of those people whose votes get valued less. This system does not afford the "equal dignity owed to each voter." *Id.* at 104. When the allegedly arbitrary system also results in a greater negative impact on groups defined by traditionally suspect criteria, there is cause for serious concern.

The Court is certainly mindful of the limited holding of *Bush*. However, we believe that situation presented by this case is sufficiently related to the situation presented in *Bush* that the holding should be the same. This holding is also consistent with the overarching theme of voting rights cases decided by the Supreme Court--that theme being, of course, "one man, one vote." Any voting system that arbitrarily and unnecessarily values some votes over others cannot be constitutional. Even without a suspect classification or invidious discrimination, "[t]he right of suffrage can be denied by debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. Therefore, Plaintiffs have sufficiently stated a claim against the Defendants for violation of equal protection.

## Due Process and Privileges and Immunities

Defendants point out that the United States Supreme Court has not recognized a right to perfect, error-free voting system, to a particular voting system, or even to certain level of convenience or effectiveness in voting. See, e.g., *Burdick vs. Takushi*, 504 U.S. 428, (1992); *MacDonald vs. Chicago Board Election Commissioners*, 394 U.S. 802 (1969). Therefore, they would argue, the complaint fails to state a constitutional due process violation. However, in *Bush* the Court held that while the individual citizen has no federal constitutional right to vote for electors for the president of the United States unless and until the state Legislature chooses a statewide election as the means to implement its power to appoint members of the electoral college, once the state legislature vests the right to vote for president in its people, the right to vote, legislatively prescribed as it is, is nevertheless a fundamental right. The question before us is whether or not such a fundamental right can be treated arbitrarily with the resulting vote dilution impacting disproportionately on two groups defined by legally suspect criteria. Plaintiffs argue that the long, proud, and increasingly powerful tradition of electoral democracy "gives rise to a right to vote under substantive due process." The right to vote in general is specifically protected by more than one constitutional amendment. [1] Further, the Supreme Court has on more than one occasion recognized that the right to vote is one of those rights that is preservative of other basic civil and political rights. *Reynolds vs. Sims*, 377 U.S. 533 at 561-562.

> Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement

---

[1] The 15th Amendment (prohibitions on the use of race, color, or previous condition of servitude); 26th Amendment (age); 19th Amendment (gender); 24th Amendment (toll taxes).

of the right of citizens to vote must be carefully and meticulously scrutinized. Almost a century ago, in *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220, the Court referred to 'the political franchise of voting' as 'a fundamental political right, because preservative of all rights'. 118 U.S., at 370, 6 S.Ct., at 1071.

In a similar vein the *Reynolds* Court went on to say:

And, if a State should provide that the votes of citizens in one part of the State should be given two times, or five times, or 10 times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted. It would appear extraordinary to suggest that a State could be constitutionally permitted to enact a law providing that certain of the State's voters could vote two, five, or ten times for their legislative representatives, while voters living elsewhere could vote only once."

Plaintiffs in the case at bar appear to be alleging a similar dilution of the voting rights of certain citizens. There is, of course, a difference in that the complained of legislative action is not a law aimed at any one group or, intended to affect directly the weight given to a single vote or a class of voters. Rather before us is a statute that is essentially administrative and regulatory in nature and which seeks to establish allowable voting procedures from which local officials may choose in order to provide a mechanism for citizens to vote in their respective voting districts. Nevertheless, it would appear that the right to vote, the right to have one's vote counted, and the right to have ones vote given equal weight are basic and fundamental constitutional rights incorporated in the due process clause of the Fourteenth Amendment to the

Constitution of the United States. If Plaintiff's complaint is true, these rights are being substantially, adversely and arbitrarily affected by the challenged statutory scheme.

An analogous situation was analyzed in the case of *Griffin vs. Burns,* 570 F.2d 1065 (1st Cir. 1978). In that case the Rhode Island Supreme Court granted a petition by a candidate to invalidate 123 absentee ballots cast in a primary election. The results of this invalidation was to take election from the certified winner and give it to the challenger. The decertified winner brought an action under *42 U.S.C. § 1983* seeking relief from the actions of the state supreme court. The district court in that case held that while there is no federal constitutional right to an absent or shut-in ballots in state primary elections, "there is an undoubted right, guaranteed by the Constitution, to vote in primary elections on an even handed basis together with other qualified voters." *Griffin v. Burns,* 431 F.Supp. 1361 at 1366. On appeal the circuit court went on to rule, "as we agree with the District Court that the state's retroactive invalidation of the absentee and shut-in ballots in this primary violated the voters' rights under the fourteenth amendment, we hold that jurisdiction lies under Section 1343 (3)." 570 F.2d at 1070. Citing *Ex-Parte Yarbrough,* 110 U.S. 651 and *United States vs. Mosley,* 238 U.S. 383 the Court held that all qualified voters have a constitutionally protected right to vote and to have their votes counted. The Court distinguished the case in hand from that in which ballots are ruled invalid due to innocent illegalities such as "a misplaced 'X' or the like", 570 F.2d 1075, by pointing out that the process by which the ballots had been invalidated had made the election itself a flawed process. That, together with the closeness of the election and the fact that the right of suffrage is fundamental, was sufficient to distinguish the failure to count the plaintiffs' votes from the type of hardship that must necessarily be borne as a consequence of the state's ruling on a previously disputed legal issue. The Court also found no merit in the

19

contention that the case posed nothing more than the type of common election irregularities which are generally beyond the ken of a federal court because they do not rise to the level of a constitutional deprivation. Indeed, the Seventh Circuit has itself refused to act in cases involving such things as malfunctioning of voting machines in an election for county office. *Hennings vs. Grafton*, 523 F.2d 861 (7th Cir. 1975). However, the case at bar is not one of an accidental malfunction or unforeseen error in counting or failing to count a particular group of ballots. What is challenged by the Plaintiffs' complaint is not an unforeseen human or mechanical irregularity which results in a diminution of someone's voting rights, but rather a statutory scheme which, depending upon the choices made by local election jurisdiction officials, will necessarily result in the dilution of an entire group of citizens' right to vote. Unless all election officials make the same choice of vote counting processes, the votes cast in some districts will have a significantly greater chance of being counted than the votes cast in neighboring election districts. If so, then, like the *Griffin* Court, we are confronted with an officially sponsored vote counting procedure which, in its basic aspect is flawed because it irrationally allows local election officials, by the choice of vote counting procedures, to assign greater importance and weight to the votes cast by one portion of the electorate. Such a situation does rise to the level of a constitutional violation. Furthermore, what Plaintiffs allege is not a question of mistakes or irregularities which can be addressed by an adequate state corrective procedure, but rather it is the state procedure itself which is alleged to cause a fundamental unfairness. The crux of the matter it appears to us is not that the Plaintiffs seek to mandate a certain level of accuracy, but rather that a law that allows significantly inaccurate systems of vote counting to be imposed upon some portions of the electorate and not others without any rational basis runs afoul of the due process clause of the U.S. Constitution. Therefore, Defendants' motion to dismiss Plaintiff's

substantive due process claim is denied. Plaintiffs have alleged a violation of their substantive due process rights.

As for Plaintiffs' privileges and immunities claim, the single paragraph devoted to it in their consolidated reply brief is an indication of its strength. Although the privileges and immunities clause of the Fourteenth Amendment has recently been revived from comatose since its knock-out in the Slaughter-House Cases, *see Saenz v. Roe*, 526 U.S. 489 (1999), no precedent whatsoever exists for extending that clause to cover situations like the one presented here. That claim, to the extent it even existed in Plaintiffs' complaint, is dismissed.

### Eleventh Amendment

The County Clerks of Alexander, Sangamon, Will, and Whiteside Counties argue that the Eleventh Amendment immunizes them from Plaintiffs' constitutional claims. However, Illinois law seems clear that the County Clerks are not state officials and therefore are not protected by the Eleventh Amendment's immunity when engaged in the supervision of elections. See *DeGenova Vs. Sheriff of Du Page County*, 209 F.3d 973, 976 (7th Cir. 2000). As pointed out in Plaintiffs' brief County clerks oversee elections, bear virtually all expenses and costs of election proceedings, and furnish voting booths, supplies and poll books for such elections. These are the types of factors which the court found in the *DeGenova* case warranted a determination that the Sheriff of the Du Page County was acting as a County officer when managing the county jail. We find that the County Clerk's are not immunized by the Eleventh Amendment.

## CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss are granted in part and denied in part as follows: Defendants' motions to dismiss Plaintiffs' claims for violation of equal protection are DENIED; Defendants' motions to dismiss Plaintiffs' claims for violation of due process are DENIED; Defendants' motions to dismiss Plaintiffs' claims for violation of the Voting Rights Act of 1965 are DENIED; Defendants' motions to dismiss Plaintiffs' claims for violation of the privileges and immunities clause of the Fourteenth Amendment are GRANTED; County Clerk Defendants' motions to be dismissed on the basis of Eleventh Amendment immunity are DENIED. ( 01C208-#43-1,44-1,46-1,58-1,64-2,66-1; 01C796-#0-1,12-1,0-1,15-1,23-1,26-1,29-1).

**SO ORDERED:**                              **ENTERED**

_Ronald A. Guzman_

**HON. RONALD A. GUZMÁN**
**United States Judge**

3/29/02